William T. LORD and Yvetta Lord,
Plaintiffs,
v.
UNITED STATES of America,
Defendant.

George A. LORD and Cora M. Lord,
Plaintiffs,
v.
UNITED STATES of America,
Defendant.

Richard H. LORD and Elizabeth C. Lord,
Plaintiffs,
v.
UNITED STATES of America,
Defendant.

P. S. LORD and Muriel T. Lord,
Plaintiffs,
v.
UNITED STATES of America,
Defendant.

Civ. Nos. 9650–9653.

United States District Court
D. Oregon.

March 30, 1960.

Robert L. Weiss and Alfred Hampson, Portland, Or., for plaintiff.

C. E. Luckey, U. S. Atty., Edward J. Georgeff, Asst. U. S. Atty., Portland, Or., for defendant.

KILKENNY, District Judge.

This is a suit for refund of income taxes by members of a partnership called P. S. Lord Associates, herein called Associates. The partnership was engaged in the construction business in Alaska, and the accounting period of the partnership involved in this suit is the fiscal year ending November 30, 1950. During 1950, Associates commenced work in Alaska on two construction contracts. Only a portion of the work on each contract was completed by November 30, 1950. On contracts running for several years, so-called long-term contracts, Associates reported its income using the "percentage of completion" method of accounting.

In reporting its income from these two contracts for the fiscal year ending November 30, 1950, Associates used the amounts and estimated percentages of completion on which its progress billings had been based. Subsequently, Associates filed an amended tax return for that fiscal year in which its income from the two contracts was computed using different percentages of completion. The percentages of completion on the amended return were determined by dividing the costs incurred to November 30, 1950, on each contract by the total cost of performing each contract. The amended return reported less income than the original return. The partners filed claims for refund based on the lesser income reported in the amended partnership return. The defendant United States of America rejected both the amended partnership return and the claims for refund.

Plaintiffs claim that the original return did not clearly reflect the income earned by the partnership in the fiscal year ending November 30, 1950. Plaintiffs claim that the amount of income reported on the original return was, in fact, higher than the amount earned by the partnership in that fiscal year. Plaintiffs

accordingly claim that their individual incomes were less, that they have overpaid their taxes for 1950, and are entitled to refunds.

In 1947, the plaintiffs William T. Lord, George A. Lord, Richard H. Lord and P. S. Lord, formed a joint venture to perform construction work. The joint venture was known as P. S. Lord Associates. All of said persons had an equal interest in Associates and shared equally in any profits or losses. Associates' activities consisted of installing plumbing, heating and ventilating systems, water and sewage systems, steam boilers and other similar facilities. This type of work is known generally in the trade as mechanical contracting or mechanical work. After 1947, additional mechanical work was undertaken by Associates, and the association of the above named plaintiffs continued until approximately 1953 when it ceased to do business.

On or about April 5, 1949, a general contractor known as Peter Kiewit Sons' Co. and Morrison-Knudsen Company, Inc. entered into a contract with defendant United States of America for the construction of a power and heating plant at Ladd Air Force Base, near Fairbanks, Alaska, hereafter called the "Ladd Field Powerhouse Contract." The general contractor will hereafter be referred to as "Kiewit." On or about April 19, 1949, Kiewit entered into a subcontract with Associates for the performance by Associates of certain portions of the Ladd Field Powerhouse Contract, consisting of installing steam generating facilities, ash handling system, plumbing, heating, ventilating and other items. Associates began work on the Ladd Field Powerhouse on or about April, 1950.

On or about March 28, 1950, Kiewit entered into another contract with defendant United States of America for construction of a military installation at Murphy Dome, near Fairbanks, Alaska, hereafter called the "Murphy Dome Contract." On or about April 14, 1950, Kiewit entered into a subcontract with Associates for the performance by Associates of certain portions of the Murphy Dome Contract, consisting of installing heating, ventilating, power plant facilities, water and fuel supply, piping and other items. Associates began work on the Murphy Dome Contract on or about July, 1950.

Associates reported its income on the basis of fiscal years ending November 30. It reported the income from longterm contracts, i. e., those contracts covering a period in excess of one year from date of execution to the date of completion, using the percentage of completion method of accounting. The percentage of completion method of accounting is an accounting method commonly followed by contractors. It is authorized by Treasury Regulations for reporting of long-term construction contracts. This method treats the job as a unit, reflecting income as work on a contract progresses.

In both the Ladd Field Powerhouse and Murphy Dome Contracts, Associates' portion of the work was only partially completed at the end of the fiscal year ending November 30, 1950, and the remainder of Associates' work on both contracts was completed in the fiscal year ending November 30, 1951. There is no dispute as to the total amount of income earned on each subcontract or as to the total amount of costs incurred on each subcontract or as to the allocation of such costs between the fiscal year 1950 and 1951.

On or about February 15, 1951, Associates filed a partnership return on form 1065 for the fiscal year 1950. The return reported as gross income the amount of $1,250,254.41 of which $843,369.60 consisted of income from the Ladd Field Powerhouse Subcontract, $277,921.72 consisted of income from the Murphy Dome Subcontract and the balance consisted of income from other work not here involved. On or about September 16, 1952, Associates filed an amended partnership return on form 1065 for fiscal year 1950. It reported as income from the Ladd Field Powerhouse Subcontract the amount of $712,836.90 and

from the Murphy Dome Subcontract the amount of $227,067.60, thereby reducing the gross income reported on the original return to $1,068,867.59. The net income reported on the amended return was $172,267.79 as contrasted with $353,654.-61 which was the amount of net income reported on the original return. The difference between the amounts of income reported on Associates' original return and on Associates' amended return for fiscal year 1950 resulted from the use of different percentages of completion on the Ladd Field Powerhouse and Murphy Dome subcontracts. The gross income reported on the original return in the case of both subcontracts was computed using percentages of completion furnished by Kiewit. These percentages had been determined for each contract for the purpose of computing progress billings on the work being performed under each contract as set forth below. On the amended return the percentage of completion was based on the direct costs of performing the work.

The computations in the case of each subcontract are set forth below.

a. *Ladd Field Powerhouse*

The Ladd Field Powerhouse subcontract was in the original amount of $1,-055,750. This amount was increased to $1,215,067.44 by various change orders in the fiscal year ending November 30, 1951. The subcontract provided that Associates should be paid monthly 90% of an amount:

"* * * proportionate to the total amount of this Subcontract, of work and materials incorporated into the construction and/or materials delivered to the site * * * as estimated by the Owner's Architect or Engineer * * * No payment on account shall operate as an approval and acceptance of the work done or materials furnished, or any part thereof."

At the request of Kiewit, the Ladd Field Powerhouse Subcontract was divided into nine major items, most of which were subdivided into two or more sub-items and Associates allocated amounts for the items and sub-items. These items were the basis for progress payments to be made to Associates. The original contract amount of $1,055,750 was then allocated among the various items and sub-items. This allocation is sometimes hereafter referred to as the "bid breakdown."

Each month Associates and a representative of the defendant United States of America would agree on an estimate of the percent of completion of each item or sub-item. The percentage figure so agreed on would be applied against the dollar amount allocated to each item or sub-item on the bid breakdown. To this was added an estimate of the amount of materials on the job site but not incorporated into the work. From the total would be subtracted all previous monthly billings, and the remainder was billed by Associates to Kiewit. In due course Associates received from Kiewit the amount so billed in accordance with Associates' subcontract. On November 30, 1950, the end of Associates' fiscal year, it had billed $843,369.60, plus the estimated amount of materials stored on the jobsite. This billing of $843,369.60 was 79.9% of the contract amount of $1,055,750. This total amount of monthly billings, that is $843,369.60, was included in Associates' original return for fiscal year 1950 as the amount of income earned on the Ladd Field Powerhouse Subcontract. On the amended return for fiscal year 1950 which Associates subsequently filed the total amount of billings to November 30, 1950 was disregarded. Instead, the percentage of completion for the fiscal year ending November 30, 1950 was computed by dividing the direct labor costs incurred on the job through November 30, 1950 by the total direct labor costs incurred for the performance of the entire subcontract. The percentage of completion so calculated was 58.67%. This percentage was then applied against the total income from the subcontract of $1,-215,067.44 to yield income earned in fiscal year 1950 of $712,836.90. The total reve-

nue received on the subcontract is higher than the original subcontract amount because of extra work and additions to the subcontract in fiscal year 1951.

#### b. *Murphy Dome*

The Murphy Dome Subcontract was in the original amount of $754,000. This amount was increased to $945,267.30 by various change orders in the fiscal year ending November 30, 1951. This subcontract contained the same provision for payment as did the Ladd Field Powerhouse Subcontract. Again, as in the case of the Ladd Field Powerhouse Subcontract, and at the request of Kiewit, the subcontract amount was allocated by items on a so-called bid breakdown. There were 20 major items and numerous sub-items in the Murphy Dome bid breakdown. The same billing procedure was followed as in the Ladd Field Powerhouse Subcontract and Associates received from Kiewit the amount so billed in accordance with Associates' subcontract. On November 30, 1950, the end of Associates' fiscal year, the total amount of monthly billings, less estimated materials stored on the jobsite, totaled $277,921.72, or 36.86% of the subcontract amount of $754,000. This total amount of monthly billings was included in Associates' original return for fiscal year 1950 as the amount of income earned on the Murphy Dome Subcontract. On the amended return which Associates filed for fiscal year 1950 the total amount of such billings to November 30, 1950 was disregarded. Instead, the percentage of completion for the fiscal year ending November 30, 1950 was computed by dividing prime costs incurred on the job through November 30, 1950 by the total prime costs incurred for the performance of the Murphy Dome Subcontract. In making this computation both direct labor costs and material costs were used as prime costs. The percentage of completion so calculated was 24.02%. This percentage was then applied against the total income from the subcontract of $945,276.30 to yield income earned in fiscal year 1950 of $227,067.60. Just as in the case of the Ladd Field Powerhouse Subcontract the total revenue received on this subcontract is higher than the original subcontract amount because of extra work and additions to the subcontract in fiscal year 1951. The plaintiffs filed amended personal income tax returns for the calendar year 1950 based on their shares of the reduced amount of income shown on Associates' amended return for fiscal year 1950. Claims for refund were filed by the plaintiffs, P. S. Lord and Muriel T. Lord on or about October 31, 1952, by the plaintiffs, William T. Lord and Yvetta Lord on or about November 10, 1952, and by plaintiffs, George A. Lord, Cora M. Lord, Richard H. Lord and Elizabeth C. Lord on or about November 13, 1952. On or about March 1, 1956 statutory notices of disallowance were mailed to the plaintiffs by registered mail notifying them of the disallowance of their claims for refund.

The issues of fact as outlined in the pre-trial order are:

1. Under the percentage of completion method of accounting what was the percentage of completion of the Ladd Field Powerhouse Subcontract on November 30, 1950?

2. Under the percentage of completion method of accounting what was the percentage of completion of the Murphy Dome Subcontract on November 30, 1950?

3. Was the accounting method used in the original partnership returns filed for the fiscal year ended November 30, 1950, in accordance with standard accounting procedures and practices?

4. But for errors of estimate intentionally made by the taxpayers to secure advances from the prime contractor, would the accounting method used in the original partnership return for the fiscal year ended November 30, 1950, clearly reflect income?

5. Did the original partnership return for the fiscal year ended November 30, 1950, clearly reflect income?

6. Did the amended partnership return for the fiscal year ended November 30, 1950, clearly reflect income?

In its original income tax return filed for the fiscal year ended November 30, 1950, Associates reported as income the total amount of its monthly invoices, the amount of which was determined and agreed upon by a representative of Associates and a representative of the United States after they had previously agreed on the percentage of completion of each contract. In said return, Associates claimed as deductions all expenses incurred during the year. The individual returns of the four partners reported as income their distributive share of the partnership profits so determined and reported and the Commissioner accepted those returns as filed.

The pertinent provisions of the Internal Revenue Code of 1939 are §§ 41 and 42, 26 U.S.C.A. (1952, §§ 41 and 42) and Treasury Regulations, § 29.41–1; § 29.41–2; § 29.41–3 and § 29.41–4; Treasury Regulations 111, promulgated under the Internal Revenue Code of 1939.

Section 29.41–4 deals with long-term contracts and reads as follows:

"Income from long-term contracts as taxable for the period in which the income is determined, such determination depending upon the nature and terms of the particular contract. As used in this section the term 'long-term contracts' means building, installation, or construction contracts covering a period in excess of one year from the date of execution of the contract to the date on which the contract is finally completed and accepted. Persons whose income is derived in whole or in part from such contracts may, as to such income, prepare their returns upon either of the following bases:

"(a) Gross income derived from such contracts may be reported upon the basis of percentage of completion. *In such case there should ac-company the return certificates of architects or engineers showing the percentage of completion during the taxable year of the entire work to be performed under the contract.* There should be deducted from such gross income all expenditures made during the taxable year on account of the contract, account being taken of the material and supplies on hand at the beginning and end of the taxable period for use in connection with the work under the contract but not yet so applied.

"(b) Gross income may be reported for the taxable year in which the contract is finally completed and accepted if the taxpayer elects as a consistent practice so to treat such income, provided such method clearly reflects the net income. If this method is adopted there should be deducted from gross income all expenditures during the life of the contract which are properly allocated thereto, taking into consideration any material and supplies charged to the work under the contract but remaining on hand at the time of completion * * *.

"A taxpayer may change his method of accounting to accord with paragraph (a) or (b) of this section only after permission is secured from the Commissioner as provided in § 29–41–2." (emphasis added)

■■ More simply stated, the principal issue in this case is whether plaintiffs may file amended returns showing the actual percentage of completion, as now claimed by them, for the use of fiscal year 1950, rather than the estimated percentage of completion on which the original returns were based.

Both subcontracts provided that Associates should be paid on or about the 15th day of each month "90% of the value, proportionate to the total amount of this subcontract, of work and materials incorporated into the construction

and/or materials delivered to the site of the work up to the first day of that month, as estimated by the owner's architect or engineer, less the aggregate of previous payments * * *." The owner referred to in this paragraph was the United States of America, the defendant here. The Army Engineer and his two assistants, representing the owner, would inspect the jobsite and would then review Associates' written estimates of the percentage of work completed, and when differences of estimates arose, they would meet together to review the estimates and agree on the percentage of completion to be used under the contract. In all instances when differences occurred, Associates' estimates of the percentage of completion were greater than the estimates of the Army Engineer. Neither the good faith nor the professional ability of the representatives of either party is attacked in this proceeding. It is clear that when the defendant's engineer over-estimated the percentage of completion, his over-estimate was partially based on the estimate of Associates and that such over-estimation of completion was fully participated in by Associates. It is obvious that each payment made pursuant to such estimates was made under the terms and conditions of Associates' subcontracts.

There is considerable confusion in the briefs about the method of accounting used by Associates. The books are in evidence and it is quite clear that the method used is what is commonly known as the accrual method of bookkeeping as modified by the "percentage of completion" method of reporting gross income. This method of reporting being used pursuant to the provisions of said Treasury regulations.

A taxpayer is bound by the accounting method he uses to determine income tax liability for a given year and is not permitted to change to another method of accounting, though equally acceptable, after the expiration of the time within which the return in question is required to be filed. 10 Mertens, Law of Federal Income Taxation, Zimet Revision, § 60.-20; Pacific National Co. v. Welch, 304 U.S. 191, 58 S.Ct. 857, 82 L.Ed. 1282, affirming 9 Cir., 91 F.2d 590; Keeler v. Commissioner, 10 Cir., 1950, 180 F.2d 707, 710. The Pacific National case is of considerable importance. There, the taxpayer sought to change its method of determining income tax from the deferred payment to the installment method of accounting. The taxpayer contended that the deferred payment method of accounting as applied in the return did not reflect true income and that use of the installment method was the only way its income could be clearly reflected. Both the Court of Appeals for the Ninth Circuit and the Supreme Court rejected these contentions. I quote from the opinion [304 U.S. 191, 58 S.Ct. 858]:

> "While petitioner's return may have been an inept application of the deferred payment method, there is nothing in it or the statement of claim for refund that gives any support to the idea that, *if rightly applied,* that method would not clearly reflect income." (Emphasis added.)

So, in the present case, if the method selected by Associates had been correctly applied by their own representative and by the engineer in charge for the owner, the method would clearly reflect income.

The method of accounting adopted by Associates in this case does clearly reflect income and both the Commissioner and the taxpayer are bound in any subsequent dispute on proper tax liability. Dally v. Commissioner, 9 Cir., 1955, 227 F.2d 724, certiorari denied 351 U.S. 908, 76 S.Ct. 699, 100 L.Ed. 1444.

Many accounting procedures can be grouped under the definition of accrual accounting. Maloney v. Hammond, 9 Cir., 1949, 176 F.2d 780. Essentially, an accrual method recognizes income when the taxpayer has an unrestricted right to the money. Continental Tie & Lumber Co. v. United States, 286 U.S.

290, 52 S.Ct. 529, 76 L.Ed. 1111; Putnam's Estate v. Commissioner, 324 U.S. 393, 65 S.Ct. 811, 89 L.Ed. 1023; Dixie Pine Products Co. v. Commissioner, 320 U.S. 516, 64 S.Ct. 364, 88 L.Ed. 420. There is no question but that Associates in this case had an unrestricted right to the money as soon as the architect or engineer for owner so certified.

Unquestionably, there is a patent difference between a "method of keeping books" and the "method of accounting for and reporting income." Commissioner of Internal Revenue v. Schuyler, 2 Cir., 1952, 196 F.2d 85; Palmer v. Commissioner, 9 Cir., 1959, 267 F.2d 434, 435, 436.

The conduct of Associates in adopting the engineer's certificates as the basis of income in their original returns clearly indicates that they accorded the Treasury Regulations and the payments under the subcontracts the same interpretation which I have given to them. In such case, the construction by a taxpayer is strong evidence of the meaning of the contract for tax purposes. Natco Corporation v. United States, 3 Cir., 1956, 240 F.2d 398, 403.

I hold that Associates adopted and used the accrual method of accounting as modified by the above Treasury Regulations and that such method clearly reflected income under the Regulations and the decisions interpreting the Internal Revenue Code. I answer issues of fact numbered 3, 4, 5 and 6 in the affirmative. Issues numbered 1 and 2 are answered by my holding on issues numbered 5 and 6.

I do not believe that the testimony of the plaintiffs' witnesses is controlling or that it is sufficient to permit a change in the method of reporting income which had been originally adopted by Associates.

Counsel for defendant shall prepare appropriate findings and judgment in each case.